**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHARLES LAPOE,

      Plaintiff,

vs.                                                      CASE NO.: 3:12-cv-132-TEM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.[1]

_____

### ORDER AND OPINION

      This case is before the Court on Plaintiff's complaint (Doc. 1), seeking review of

the final decision of the Commissioner of the Social Security Administration ("the

Commissioner") denying Plaintiff's claim for a period of disability and disability insurance

benefits ("DIB"). Both parties have consented to the exercise of jurisdiction by a

magistrate judge, and the case has been referred to the undersigned by the Order of

Reference dated May 4, 2012 (Doc. 10).  The Commissioner has filed a transcript of the

underlying administrative proceedings and evidentiary record (hereinafter referred to as

"Tr." followed by the appropriate page number).

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Upon review of the record, the Court has found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the Court in making its determination.  Accordingly, the matter has been decided on the written record.  For the reasons stated herein, the Commissioner's decision is **REVERSED** and the case is **REMANDED** for additional proceedings.

## I. PROCEDURAL HISTORY

In the instant action, Plaintiff protectively filed an application for disability insurance benefits ("DIB") on September 26, 2007, with an alleged onset date of September 19, 2007 (Tr. 151-204).  Plaintiff's application was denied initially on January 29, 2008, and upon reconsideration on January 6, 2009 (Tr. 66-71).  Plaintiff requested an administrative hearing, which was held on March 1, 2010, in Jacksonville, Florida (Tr. 28-65).  The administrative law judge ("ALJ") issued a decision denying Plaintiff's claim on May 14, 2010 (Tr. 8-27).  Plaintiff filed a request for review, which the Appeals Council denied on December 21, 2011 (Tr. 1-7).  Plaintiff's current counsel of record L. Jack Gibney, Esquire, filed the instant action in federal court on February 6, 2012, requesting this Court reverse and set aside the decision of the Commissioner, or remand for a *de novo* hearing (Doc. 1).

## II. BACKGROUND

### A. Summary of Medical Evidence Before the ALJ[2]

Plaintiff has past medical history of coronary artery disease and underwent a coronary artery bypass graft surgery after suffering a heart attack in 1998 (Tr. 234).

---

[2] Because Plaintiff focuses on his physical impairments in his appeal, the Court summarizes the relevant medical evidence relating to these impairments.

Plaintiff also has uncontrolled hypertension and hyperlipidemia. *Id.* Plaintiff has been a heavy smoker most of his life and smoked a pack a day until at least January of 2010 (Tr. 13, 235). Plaintiff was admitted into progressive care two times in 2002 after complaining of chest and abdominal pain (Tr. 234, 248).

On August 5, 2005, Plaintiff had a CT angiography of the brain which found no abnormalities (Tr. 429). Plaintiff also had an MRI of the brain which showed diminished flow in the right vertebral artery and a few small foci indicative of chronic small vessel ischemic disease (Tr. 431). No stenosis was found but a lobulated appearance of the left internal carotid artery was noted (Tr. 433). On August 6, 2005, an ultrasound was performed on Plaintiff's arteries and the attending physician found diminished flow within the arteries (Tr. 290, 435). On August 8, 2005, Plaintiff was administered a stress test and the doctor found a low probability for prior myocardial infraction, no evidence of stress induced ischemia, and a normal ventricular cavity size (Tr. 282, 427). Plaintiff's carotid stenoses were also evaluated (Tr. 323). The examination found multiple stenoses of the left common artery from fifty to eighty percent (Tr. 324).

On August 10, 2005, Plaintiff underwent an echo doppler study which revealed Plaintiff to be mostly functioning within normal limits aside from some hypokinesia[3] of the left ventricle (Tr. 422). On August 12, 2005, Plaintiff underwent an anterior-posterior view of the chest which revealed a concern for a nodule in the right lung base (Tr. 423). On August 13, 2005, Plaintiff had a CT of the thorax performed which found several granulomata and nodularity on the left lower lung (Tr. 425). Conservative follow-up was

---

[3] Hypokinesia is "abnormally diminished motor function or activity." THE FREE MEDICAL DICTIONARY, http://medical-dictionary.thefreedictionary.com/hypokinesia (last visited Feb. 15, 2013).

recommended. *Id.* On August 15, 2005, Plaintiff underwent a left heart catheterization with coronary and graft angiography and left ventriculogram (Tr. 326). The attending physician, Dr. Ferris George of St. Augustine Cardiology Associates, concluded Plaintiff had moderate/severe coronary disease diffuse (Tr. 328).

On August 31, 2005, Plaintiff had a follow-up appointment with Dr. George after a left heart endarterectomy[4] (Tr. 319). Dr. George noted Plaintiff needed a right-sided endarterectomy. *Id.* A month later, on September 22, 2005, Plaintiff was doing well and was to be admitted for a repeat left heart catheterization (Tr. 294). On September 26, 2005, Plaintiff was examined for a follow-up appointment by Dr. George after a stent[5] to his right coronary artery (Tr. 318). At the time, he did not have any chest discomfort or shortness of breath, and he stated he had stopped smoking. *Id.* He complained of claudication.[6] *Id.*

On January 9, 2006, Plaintiff was examined after complaining of a tingling feeling in his arms and hands (Tr. 317). He reported he was trying to cut back on cigarette usage and had no significant complaints of chest discomfort. *Id.*

On April 10, 2006, Dr. George examined Plaintiff concerning his coronary artery disease (Tr. 316). Plaintiff reported he was doing extremely well. *Id.* Dr. George stated Plaintiff was under reasonable risk control, except for his continued smoking. *Id.* He

---

[4] "Endarterectomy is an operation to remove or bypass the fatty deposits, or blockage, in an artery narrowed by the buildup of fatty tissue." THE FREE MEDICAL DICTIONARY, http://medical-dictionary.thefreedictionary.com/endarterectomy (last visited Feb 15, 2013).

[5] "Stents are small expandable tubes used to treat narrowed or weakened arteries in the body." *Cardiac Stents Overview,* WEDMD.COM, http://www.webmd.com/heart-disease/guide/stents-types-and-uses (last visited Feb. 15, 2013).

[6] Claudication is "pain and/or cramping in the lower leg due to inadequate blood flow to the muscles." MEDICINE.NET, http://www.medicinenet.com/claudication/article.htm (last visited Feb. 15, 2013).

was scheduled to have a carotid Doppler examination and advised to follow up in four months. *Id.* On April 24, 2006, Plaintiff was administered a treadmill stress test during which the cardiologist found mild ischemic changes to the left ventricle and observed Plaintiff's physical ability was limited due to leg pain (Tr. 477, 732). On May 1, 2006, Plaintiff was administered a stress versus rest cardiolite examination and a treadmill stress test (Tr. 279, 280, 320). The tests revealed mild ischemic changes to the anterior and the inferolateral region of the left ventricle and limitation in Plaintiff's ability due to leg pain. *Id.*

Plaintiff was examined on May 11, 2006 by Dr. Derek Muehrcke at Flagler Hospital (Tr. 472). Dr. Muehrcke found Plaintiff had significant right internal carotid artery stenosis,[7] and recommended a right carotid endarterectomy. *Id.* Dr. George determined Plaintiff was stable from a cardiovascular standpoint to undergo surgery (Tr. 476). Plaintiff underwent the right carotid endarterectomy on May 31, 2006 (Tr. 473-75, 481). After surgery, Plaintiff was found to be stable and recuperating very well (Tr. 630, 634). Plaintiff returned to Dr. George for a follow-up visit on August 14, 2006 (Tr. 315). Plaintiff reported he was doing well and he had received a promotion at work and was doing more physical work there. *Id.*

On January 18, 2007, Plaintiff was examined by Dr. Muehrcke for an infection in the right carotid endarterectomy and hypertension (Tr. 291, 489). He was advised to stop smoking. *Id.* Plaintiff's heart was mildly enlarged but there were no findings of congestive failure (Tr. 308). Plaintiff underwent a lateral chest exam and a CT of the

---

[7] Cartoid artery stenosis is "narrowing of the carotid arteries, the two major arteries that carry oxygen-rich blood from the heart to the brain." *Cartoid Stenosis (Cardtid Artery Disease),* MAYFIELD CLINIC, http://www.mayfieldclinic.com/PE-CarotidStenosis.htm (last visited Feb. 15, 2013).

neck (Tr. 499, 500).  The next day Plaintiff was operated on for an abscess on his right neck, which was drained (Tr. 310).  His blood vessels were normal and no irregularities (besides expected postoperative changes) were found (Tr. 311).  However, there was evidence of bronchial wall thickening (Tr. 499).

 On January 25, 2007, Dr. Daniel B. Cox, a specialist in Internal Medicine, examined Plaintiff for an initial evaluation.  He reported Plaintiff's prognosis was not good considering his young age and the extent of his vascular disease (Tr. 524).  Dr. Cox noted Plaintiff smelled strongly of cigarettes, so much so that the smell lingered after Plaintiff exited the room (Tr. 525).  Dr. Cox assessed coronary artery disease, carotid artery disease, peripheral vascular disease, smoker, chronic bronchitis, and hyperlipidemia (Tr. 524).

On February 9, 2007, Plaintiff was examined by Dr. Muehrcke, who took a CT of Plaintiff's abdomen and pelvis and found scarring in the kidney and granuloma in the right pulmonary base (Tr. 286, 306, 520). Additionally, Plaintiff had narrowing and plaquing involving the distal most infrarenal abdominal aorta (Tr. 539).  On February 16, 2007, Dr. Cox referred Plaintiff for a lower extremity arterial exam (Tr. 543).  The exam revealed moderately abnormal Ankle-Brachial Index of .65 - .79 on the left side.  *Id.*

On March 13, 2007, Plaintiff was examined by Dr. Cox who stated Plaintiff's blood pressure had improved since January (Tr. 527).   Plaintiff complained of a sharp pain in his left leg and some dizziness.  *Id.*  On March 22, 2007, Plaintiff was examined by Dr. Cox after sustaining an injury the night before to his left calf, and was advised to stay off his feet and keep his leg elevated  (Tr. 526).  On March 23, 2007, Plaintiff was examined and found to have high density collection in the lower leg compatible with a

hematoma (Tr. 304, 536).  On April 10, 2007, Plaintiff had an MRI of the left ankle after complaining of chronic ankle pain on April 6, 2007 (Tr. 368, 371). The attending physician noted findings compatible with distal achilles tendinitis, but found no evidence of a tear or rupture.  *Id.*

On June 17, 2007, Plaintiff was examined for abdominal pain, and the attending physician found the abdominal aorta to be mildly narrowed, which was unchanged from a previous exam in February of 2007 (Tr. 382).  The liver, spleen and adrenal glands were all unremarkable, except for a calcified granuloma in the spleen (Tr. 381). On June 18, 2007, Dr. Cox examined Plaintiff due to Plaintiff's complaints of abdominal pain (Tr. 528). Dr. Cox did not find anything abnormal and suspected Plaintiff was getting analgesic patches from another practitioner.  *Id.*

On August 27, 2007, follow-up reports from St. Augustine Cardiology indicated Plaintiff was feeling fatigued from working too many hours and was experiencing  aches and pains (Tr. 706).  However, he denied any chest pain and his heart had a regular rate and rhythm.  *Id.*  He was still working and still smoking, and his hypertension was under poor control.   *Id.*  He was diagnosed with aggressive atherosclerotic[8] disease and advised to stop smoking.  *Id.*

On September 20, 2007, Plaintiff was examined for abdominal pain and the doctor believed he had pancreatitis (Tr. 364, 384).  Plaintiff was complaining of nausea, fatigue, headaches, easy bruising, loss of appetite, itching and change in vision (Tr. 366). Plaintiff's chest was examined but there was no evidence of acute pulmonary disease

---

[8] Atherosclerotic means "thickening and hardening of the walls of the arteries from fat deposits on their inner lining." *Definition of Atherosclerotic,* MEDICINENET.COM http://www.medterms.com/script/main/art. asp?articlekey=25928 (last visited Feb. 15, 2013).

(Tr. 532). Plaintiff underwent a magnetic resonance choloangiopancreatography on September 25, 2007 (Tr. 379, 521). The exam found normal filling of the gallbladder and normal-to-high ejection (Tr. 380). Plaintiff had a follow-up visit on October 3, 2007, at which time he was still complaining of abdominal pain (Tr. 386). However, the physical exam revealed everything as normal and the physician stated Plaintiff's pancreatitis was resolved (Tr. 387).

On October 8, 2007, Dr. Cox completed a Physician's Report for the Florida Retirement System (Tr. 836). Dr. Cox stated Plaintiff's primary disabling condition was coronary artery disease, and secondary conditions were peripheral vascular disease and carotid artery disease (Tr. 837). Dr. Cox stated Plaintiff's condition was not stabilized, and he had "[s]evere limitation of functional capacity; permanently incapable of any kind of work; totally and permanently disabled from gainful employment." *Id.*

On October 14, 2007, Plaintiff was again admitted complaining of abdominal pain and vomiting (Tr. 390). During the physical exam, Plaintiff reported tenderness in the abdominal and had active bowel sounds (Tr. 392, 393). Plaintiff underwent a CT of the abdomen and pelvis (Tr. 399). Most of the scan revealed normal functioning except for some question of mild edema at the pancreas which suggested Plaintiff was suffering from mild pancreatitis (Tr. 400). The gallbladder and abdomen were clear except for a benign nodule on the right lung base (Tr. 401-02). Dr. Cox examined Plaintiff on October 18, 2007 (Tr. 552). He noted Plaintiff had recently been in the emergency room for inflammation around his pancreas, or low grade pancreatitis. *Id.* Dr. Cox stated Plaintiff was scheduled for an endoscopy and a cholecystectomy. *Id.*

8

On October 19, 2007, Plaintiff had a portable chest x-ray which found no acute cardiopulmonary process (Tr. 460).  Plaintiff also had a gallbladder ultrasound and an inspection of the liver which found possible gallbladder wall thickening but no evidence of acute cholecystitis[9] (Tr. 462).

On October 20, 2007, Plaintiff was admitted to the ICU for four days for abdominal pain, nausea and vomiting (Tr. 440).  He was diagnosed with chronic pancreatitis.  *Id*. Plaintiff reported he had been experiencing abdominal problems with severe pain from his lower chest to his thighs for the past four months (Tr. 442).  The attending physician stated Plaintiff likely had pancreatitis and although there were no gallstones present, he recommended Plaintiff undergo a cholecystecomy (Tr. 444, 450).  A CT was done of Plaintiff's abdomen and the findings were consistent with acute pancreatitis (Tr. 463).  A chest x-ray and gallbladder ultrasound showed no acute cardiopulmonary process, possible gallbladder wall thickening and medical renal disease (Tr. 597-598).  Plaintiff also underwent a liver function nuclear medicine study which revealed no evidence of acute cholecystitis (Tr. 599).  After a consultation, the attending physician determined that, although Plaintiff had a history of coronary disease, his current condition appeared to be stable and Plaintiff could undergo surgery if necessary with moderate risk (Tr. 583).

On November 20, 2007, Dr. Cox examined Plaintiff and noted Plaintiff was doing fairly well and was having problems with his disability insurance (Tr. 538). The same day, Dr. George examined Plaintiff and noted Plaintiff was stable after his May 1, 2006 heart catheterization, and had mild to moderate risk from a cardiovascular standpoint for his cholecystectomy (Tr. 564).

---

[9] Cholecytitis is "inflammation of the gallbladder." *Cholecytitis,* MEDSCAPE, http://emedicine.medscape. com/article/171886-overview (last visited Feb. 15, 2013).

On December 11, 2007, Plaintiff was examined for a follow-up visit and stated overall he was doing well (Tr. 565). Plaintiff had no complaints of chest pains and his abdominal pain was controlled. *Id.* He was advised to quit smoking. *Id.* Plaintiff also had a chest x-ray that found nodules and granuloma (unchanged), but no evidence of acute pulmonary disease (Tr. 873).  On December 18, 2007, Plaintiff was examined because of chronic pancreatitis concerns, although the ultrasound did not reveal any evidence of cholelithiasis[10] (Tr. 558). He underwent a laparoscopic choleycystectomy that day (Tr. 561).  There were no complications during the surgery (Tr. 571).  Plaintiff was examined after the surgery and there were no findings to support a retained stone (Tr. 574).

On January 16, 2008, Dr. Cox examined Plaintiff after his gallbladder surgery and noted his strong cigarette smell, but otherwise noted his conditions as stable (Tr. 676). Although Plaintiff had some complaints of chest pain, he was recovering from his pancreatitis well and the pain in his abdomen had subsided (Tr. 677).

On January 25, 2008, Dr. Debra Troiano, M.D. completed a Physical Residual Functional Capacity Assessment (Tr. 648).  Dr. Troiano found Plaintiff could occasionally lift twenty pounds, could frequently lift ten pounds, and could sit or stand for a total of six hours during an eight hour work day (Tr. 649).  Dr. Troiano found Plaintiff had no pushing or pulling limitations, and Plaintiff's only postural limitation was that he could never climb a ladder, rope or scaffold (Tr. 650).  Dr. Troiano noted Plaintiff had mild to moderate functional limitations and stated, "He appears capable from a physical standpoint of

---

[10] Cholelithiasis is gallstone disease. *Cholelithiasis*, MEDSCAPE, http://emedicine.medscape.com/article/ 175667-overview (last visited Feb. 15, 2013).

performing SGA with limitations described in this report." (Tr. 653).   Dr. Troiano found Plaintiff's allegations to be consistent with the medical evidence in the record.   Id.

On March 3, 2008, Plaintiff visited Dr. Allain A. Girouard, an orthopedic surgeon at St. Johns Orthopaedic & Spine Institute, upon referral from Dr. Cox for lower back pain with leg pain (Tr. 672).   Dr. Girouard determined Plaintiff had degenerative disc and joint disease with elements of spondylosis causing some radioculopathy.   Id.   Dr. Girouard discussed various options of treatment, including possible cortisone injections, medications, stimulation implantable devices, use of a brace, and surgical intervention. Id.

On March 12, 2008, Plaintiff followed up with Dr. George (Tr. 704).   Plaintiff reported he was experiencing sharp shooting pains, shortness of breath and extreme fatigue even after mild activity.   Id.   Plaintiff stated he sleeps for twenty-four hours at a time.   Id.   Dr. George scheduled Plaintiff for treadmill testing to evaluate his fatigue and shortness of breath.   Id.   Plaintiff underwent a treadmill exercise exam on March 18, 2008,   (Tr. 660).   Dr. George found mildly abnormal myocardial perfusion[11] with no ischemia.   Id.   Additionally, Plaintiff had mild hypokinesis[12] of the septum which can be seen with coronary disease and hypertension (Tr. 661).   Plaintiff also had mild plaquing of the abdominal aorta, but no plaquing and a normal flow in his left and right carotid (Tr. 663, 664).

---

[11] Myocardial perfusion is "the flow of blood to the heart muscle." *Myocardial perfusion,* THE FREE ONLINE MEDICAL DICTIONARY, http://medical-dictionary.thefreedictionary.com/myocardial+perfusion (last visited Feb. 15, 2013).

[12] Hypokinesis is "diminished or abnormally slow movement." *Hypokinesis,* THE FREE ONLINE MEDICAL DICTIONARY, http://medical-dictionary.thefreedictionary.com/hypokinesis (last visited Feb. 15, 2013).

On April 3, 2008, Dr. Cox examined Plaintiff and noted his blood pressure was up, which "distressed" Dr. Cox (Tr. 675).  Plaintiff had no complaints of chest pain.  Dr. Cox adjusted Plaintiff's medications and directed him to return for follow-up in three to four months.  *Id.*

On April 24, 2008, Dr. Girouard completed an Attending Physician Statement for UnumProvident Benefits Center (Tr. 689-90).  Dr. Girouard stated Plaintiff's chronic pain decreases his ability to concentrate and Plaintiff would be limited to a sedentary residual functional capacity (Tr. 689-90). Dr. Girouard also noted Plaintiff could sit, stand or walk for a maximum of one hour per workday; could occasionally climb and reach above shoulder level; could never twist/bend/stoop or operate heavy machinery; could occasionally carry up to twenty pounds, but never carry any greater weight; and could frequently perform fine finger movements and hand-eye coordinated movements, but never push or pull.  (Tr. 690).  Dr. Girouard indicated he had advised Plaintiff not to return to work.  *Id.*

On May 18, 2008, Dr. Girouard completed a Physician's Report for the Florida Retirement System (Tr. 839).  He indicated that Plaintiff's condition has stabilized, Plaintiff had reached maximum medical improvement, and Plaintiff was not a candidate for vocational rehabilitation.  *Id.*  Dr. Girouard stated Plaintiff had "[s]evere limitation of functional capacity; permanently incapable of any kind of work; totally and permanently disabled from gainful employment."  *Id.*

On June 16, 2008, Dr. Girouard examined Plaintiff for pain in Plaintiff's back and neck that radiated to his legs (Tr. 667, 687).  Dr. Girouard discussed "the pros and cons

of continued conservative care versus surgery" and decided to "continue with conservative modalities until such time that he is no longer able to function and move forward with surgery, which would be substantially more risky seeing his cardiac pathology." *Id.* Dr. Girouard concluded, "We are placing surgery on hold at this present moment until such time that he can no longer function.  He remains at this present moment disable[d] especially from his cardiac function more so than his back" (Tr. 687). Dr. Girouard also advised Plaintiff to stop smoking. *Id.*

On June 17, 2008, Dr. George examined Plaintiff, who reported he was feeling well overall and had been swimming to increase his exercise (Tr. 702).  Plaintiff's condition was mostly stable with elevated CPK level and high blood pressure. *Id.* Dr. George reported Plaintiff's coronary artery disease was clinically stable with no complaints of chest pain. *Id.*

On September 16, 2008, Dr. George examined Plaintiff (Tr. 701). Plaintiff stated he was feeling well overall except for periodic fatigue. *Id.* Plaintiff reported he was maintaining his current activity level without much difficulty. *Id.* Plaintiff was still smoking. *Id.* Plaintiff's coronary artery disease and carotid artery disease were clinically stable, Plaintiff's hypertension was under improved control, and Plaintiff was started on new medication to treat his dislipidemia. *Id.*

On November 11, 2008, Plaintiff was examined by Dr. Cox at a follow-up appointment (Tr. 826).  Plaintiff reported any type of exercise forced him to spend the next day in bed recuperating, and he was experiencing head pressure, pain in his right ear, and pain when he coughed. *Id.* Dr. Cox recommended Plaintiff stop smoking. *Id.*

Dr. Cox noted Plaintiff's laboratory work showed he had "a double than normal average of risk factor for heart attack and stroke." *Id.*

On December 6, 2008, Plaintiff was examined by consulting physician Dr. Eftim Adhami (Tr. 744-48).  Plaintiff reported he experiences chest pain, lower back and leg pain, and shortness of breath when he walks very much (Tr. 747).  Plaintiff reported he had stopped smoking, and he had not worked since September of 2007.  *Id.*  Dr. Adhami reported Plaintiff limps when he walks without a cane due to reported back pain (Tr. 748).  Plaintiff reported he had used a cane for two years for stability and balance.  Id.  Dr. Adhami found: Plaintiff's walk on his toes and heels was normal; he had 5/5 muscle strength in all muscles; he had full range of motion in his back with pain reported in the flexion and palpation of L5-S1 area; and his joints were free in movement without signs of inflammation or fluid (Tr. 747-48).  Dr. Adhami diagnosed coronary artery disease; carotid blockage treated successfully by endarterctomy bilaterally; lower back pain of unknown origin, no signs of radiculopathy; peripheral artery disease due to inheritance from father and smoking; hyperlipidemia; and shortness of breath with a history of smoking (Tr. 748).  Dr. Adhami stated Plaintiff may need a Doppler of the lower arteries and may need a spirometry to rule out COPD.  *Id.*  Dr. Adhami found Plaintiff needs to use a cane for long walks due to his peripheral artery disease.  *Id.*

On January 5, 2009, Dr. Robert Steele, M.D. completed a Physical Residual Functional Capacity Assessment (Tr. 768-75).  He found Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds and could sit or stand for six out of eight hours in a work day (Tr. 769).  Dr. Steele also found Plaintiff had no pushing or pulling

14

limitations and could only occasionally climb ladders, ropes, or scaffolds (Tr. 769-770). Dr. Steele found Plaintiff should avoid concentrated exposure to extreme heat, extreme cold, vibration, fumes, odors, dusts and gas, and hazards (Tr. 772). Dr. Steele found the severity of Plaintiff's symptoms and the alleged effects on function to be consistent (Tr. 773).

On January 12, 2009, Plaintiff received a radiology consultation report regarding Plaintiff's complaints of worsening lower back pain over the past ten years and severe neck pain (Tr. 840). The radiologist, Dr. K. Kevin Shamlou, found slight degenerative changes in the disc space and facets, and chronic atherosclerotic calcifications, but no significant compression deformities, spondylolisis or spondylolesthesis. *Id.* Dr. Shamlou's impression was chronic changes. *Id.*

On February 24, 2009, Dr. Girouard referred Plaintiff to Dr. Gregory Adkinson at Lighthouse Pain & Spine Specialists for complaints of back and leg pain (Tr. 781-82). Dr. Adkinson noted Plaintiff was in no apparent distress but was in obvious discomfort (Tr. 781). Dr. Adkinson stated Plaintiff had good strength on shoulder shrug and head turn and had "5/5 strength on flex and extension of wrists, elbows, shoulders, hips, and knees bilaterally" (Tr. 782). However, Dr. Adkinson noted Plaintiff had an antalgic gait and stance, and used a cane as an assistive device. *Id.* Plaintiff had limited flexion and extension of his trunk, which caused low back pain. *Id.* Dr. Adkinson assessed Plaintiff with: coronary artery diease; peripheral vascular disease; chronic low back pain consistent with facet arthropathy[13] and degenerative changes of his facet joints on his

---

[13] Arthropathy is any joint disease. *Arthropathy,* THE FREE ONLINE MEDICAL DICTIONARY, http://medical-dictionary.thefreedictionary.com/arthropathy (last visited Feb. 27, 2013).

pain films of his lower spine; bilateral lower extremity L5 and S1 radiculopathy consistent with a nerve impingement syndrome;[14] and COPD. *Id.* Dr. Adkinson prescribed additional medications and requested Plaintiff follow-up in one month. *Id.*

On March 18, 2009, Plaintiff visited Dr. Cox for follow-up (Tr. 819). Plaintiff reported he was having trouble with his back recently and had difficulty getting around despite wearing a brace. *Id.* Dr. Cox noted Plaintiff has extensive vascular disease, coronary artery disease, carotid artery disease, peripheral arterial disease, and he was symptomatic with all of them. *Id.* Dr. Cox noted Plaintiff was currently taking ten medications. *Id.* Dr. Cox stated he considered Plaintiff "permanently disabled due to multiple symptoms, including shortness of breath and inability to do much without giving out." *Id.* Dr. Cox reported Plaintiff's prognosis was not good, and stated, "I do not understand the problem [he] is having getting on disability." *Id.* Dr. Cox told Plaintiff to continue on his medications and return in a few months for a comprehensive exam. *Id.*

On March 31, 2009, Plaintiff followed up with Dr. George (Tr. 790). Plaintiff stated he was doing well and remained active but experienced occasional headaches after taking his medication. *Id.* Dr. George noted Plaintiff's conditions were stable. *Id.*

Plaintiff returned to Dr. Cox on June 23, 2009 (Tr. 818). Dr. Cox reported Plaintiff continued to have trouble with his back and neck and expressed frustration at Plaintiff's difficulty obtaining disability and the amount of paperwork required by Plaintiff's insurance company. *Id.* Plaintiff had occasional dizziness, decreased breath sounds and a few scattered wheezes (Tr. 817). Dr. Cox reported Plaintiff could not do any

---

[14] Radiculopathy is "a condition due to a compressed nerve in the spine that can cause pain, tingling, or weakness along the course of the nerve." *Radiculopathy,* MEDICINENET.COM, http://www.medicinenet.com/radiculopathy/article.htm (last visited Feb. 27, 2013).

heavy activity without experiencing discomfort and Plaintiff avoided strenuous activity. *Id*. Dr. Cox assessed coronary artery disease, carotid artery disease, peripheral vascular disease with vascular insufficiency to lower extremities, chronic obstructive pulmonary disease, chronic bronchitis, active smoker, hyperlipidemia, and status post cholecystectomy with pancreatitis (Tr. 816). Dr. Cox noted Plaintiff's prognosis was guarded because of multisystem disease and continued smoking (Tr. 815).

Plaintiff returned to Dr. George on October 2, 2009, complaining of low back pain radiating down his legs particularly while walking, increased dyspnea on exertion and chest pressure, impotence and severe pain in his groin. (Tr. 789). Dr. George indicated a desire to have an updated Adenosine Cardiolite stress test to investigate Plaintiff's shortness of breath and chest discomfort and to determine the risks associated with stopping certain medications so that Plaintiff could have an injection to relieve his lower back pain. *Id.* On November 2, 2009, Plaintiff underwent a stress test with Dr. George which revealed "[n]ormal pharmacological stress demonstrating mild chest tightness and shortness of breath and non-specific wave changes" (Tr. 796). On November 11, 2009, Plaintiff had an examination with Dr. George to review the results of his stress test, which were normal (Tr. 788). Plaintiff reported he was doing well and had no complaints of chest pain or shortness of breath. *Id.* Plaintiff's heart had regular rate and rhythm and his lungs were clear bilaterally to auscultation. *Id.*

### B. Summary of the ALJ's Decision

A plaintiff may be entitled to disability benefits under the Social Security Act if he is unable to engage in substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.   42 U.S.C. § 1382c(a)(3)(A).   The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. § 404.1520; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b).   Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c).   Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.   20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e).   Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.   20 C.F.R. § 404.1520(f).   A plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

In the instant case, at step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since September 19, 2007, the alleged onset date (Tr. 13).   At step two, the ALJ found Plaintiff suffered from the severe impairments of coronary artery disease and degenerative disc disease. *Id.* The ALJ found Plaintiff's chronic obstructive pulmonary disease and anxiety to be non-severe impairments (Tr. 13-14).   At step three,

the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P. (Tr. 14). At step four, the ALJ found Plaintiff retained the residual functional capacity ("RFC") "to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except he is unable to climb, balance, stoop, kneel, crouch, or crawl" (Tr. 15). The ALJ then found Plaintiff unable to perform his past relevant work as a coal miner and as a custodian supervisor (Tr. 21). At step five, utilizing the testimony of a vocational expert, the ALJ found there were other jobs existing in significant numbers in the national economy Plaintiff could perform, including an order clerk, a document preparer, and a call out operator (Tr. 21-22). Therefore, the ALJ found Plaintiff was not under a disability from September 19, 2007, the alleged onset date (Tr. 22).

## III.  STANDARD OF REVIEW

The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is defined as more than a scintilla, i.e., evidence that must do more than create a suspicion of the existence of the fact to be established . . . and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence that is favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so. Although the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

In all Social Security disability cases, the plaintiff bears the ultimate burden of proving disability and is responsible for furnishing or identifying medical and other evidence regarding the claimed impairments. *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence

thereof as the Commissioner of Social Security may require.").  It is the plaintiff's burden to provide the relevant medical and other evidence establishing disabling physical or mental functional limitations.  20 C.F.R. § 404.704.

## IV. ANALYSIS

Plaintiff raises two arguments on appeal.  First, Plaintiff argues the ALJ failed to give appropriate weight to the opinions of his treating physicians, Dr. Cox and Dr. Giround.  Second, Plaintiff argues the ALJ failed to include all of Plaintiff's limitations in the hypothetical posed to the VE.

It is well established in the Eleventh Circuit that, generally, substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is "good cause" to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).  The Eleventh Circuit has concluded "good cause" exists when:  (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips v. Barnhart,* 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  "Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence," a reviewing court cannot "disturb the ALJ's refusal to give the opinion controlling weight." *Carson v. Comm'r of Soc. Sec.*, 300 Fed. Appx. 741, 743 (11th Cir. 2008) (per curiam)

(citations omitted).[15]   However, when discrediting the opinion of a treating physician, the ALJ must explicitly set forth the rationale for doing so and the failure to do so is reversible error.   *Lewis,*125 F.3d at 1440.   "Conclusory statements by an ALJ to the effect that an opinion is inconsistent with or not bolstered by the medical record are insufficient to show that an ALJ's decision is supported by substantial evidence unless the ALJ articulates factual support for such a conclusion." *Kahle v. Comm'r of Soc. Sec.*, 845 F. Supp. 2d 1262, 1272 (M.D. Fla. 2012).

In the instant case, the ALJ provided an identical rationale for discounting the opinions of Dr. Cox and Dr. Girouard:

> I have considered the opinion of [Dr. Cox/Dr. Girouard] and give it appropriate weight. I note that [Dr. Cox/Dr. Girouard] has a treatment history with the claimant; however, his opinion is not supported by his own treatment records and is inconsistent with the evidence of record when considered in its entirety. I note that [Dr. Cox/Dr. Girouard's] own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled and the course of treatment pursued by [Dr. Cox/Dr. Girouard] has not been consistent with what one would expect if the claimant were truly disabled. Furthermore, the claimant has been strongly advised to stop smoking on numerous occasions by several of his treating physicians; however, he continued to smoke through at least January of 2010

(Tr. 16, 17, 19).   The ALJ found both Dr. Cox and Dr. Girouard's opinions to be unsupported by their own treatment records and inconsistent with the evidence of record. However, the ALJ failed to point to specific evidence in the record to support her conclusions.   Although the ALJ used the triggering language for the "good cause" exception, her conclusions are unsubstantiated by reference to specific evidence in the record, and provide the reviewing Court with little guidance in determining whether the

---

[15] Unpublished opinions may be cited as persuasive authority pursuant to the Eleventh Circuit Rules.  11th Cir. R. 36-2.

findings are supported by substantial evidence.  *See Kahle*, 845 F. Supp. 2d at 1272 ("Conclusory statements by an ALJ to the effect that an opinion is inconsistent with or not bolstered by the medical record are insufficient to show that an ALJ's decision is supported by substantial evidence unless the ALJ articulates factual support for such a conclusion."); *Stroman v. Astrue*, 08-22881-CV, 2009 WL 3669640, at *3 (S.D. Fla. Nov. 4, 2009) (holding ALJ failed to clearly articulate the reasons for rejecting treating physician's opinion when ALJ noted "opinion was contrary to other medical evidence, but did not specify what that evidence was," and noted "opinion was inconsistent with her treatment notes but did not specify how that was the case"); *Paltan v. Comm'r of Soc. Sec.,* No. 6:07CV932-ORL-19DAB, 2008 WL 1848342, at *5 (M.D. Fla. Apr. 22, 2008) ("The ALJ's failure to explain how [treating physician's] opinion was 'inconsistent with the medical evidence' renders review impossible and remand is required."); *Poplardo v. Astrue,* 3:06-CV-1101-J-MCR, 2008 WL 68593, at *11 (M.D. Fla. Jan. 4, 2008) (holding ALJ failed to clearly articulate the reasons for rejecting treating physician's opinion when ALJ found opinion was inconsistent with other evidence of record and unsupported by medical evidence but failed to substantiate findings by reference to specific evidence).

While it is incumbent upon this Court to "view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision" to ascertain whether the ALJ's decision is based on substantial evidence, it is also important to refrain from re-weighing the evidence.  *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Although the Commissioner raises persuasive arguments as to why the opinions of Dr. Cox and Dr. Girouard are due

to be discredited, *post hoc* rationalizations set forth in Defendant's memorandum will not cure this defect in the ALJ's decision. *See Baker v. Comm'r of Soc. Sec.*, 384 Fed. Appx. 893, 896 (11th Cir. 2010) (noting the Supreme Court's holding that a court may not accept appellate counsel's *post hoc* rationalizations for defective agency decisions). It is well established that "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citing *Knipe v. Heckler*, 755 F.2d 141, 149 n.16 (10th Cir.1985) and *Dong Sik Kwon v. INS*, 646 F.2d 909, 916 (5th Cir.1981) (en banc)).

Additionally, the ALJ must state the weight given to a treating physician with particularity. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Here, the ALJ simply stated she gave the opinions of Dr. Cox and Dr. Girouard "appropriate weight" (Tr. 16, 17). This ambiguous language is insufficient to guide this Court in its determination of whether the ALJ's decision is supported by substantial evidence. *See Belge v. Astrue,* 3:09-CV-529-J-JRK, 2010 WL 3824156, at *4 (M.D. Fla. Sept. 27, 2010) ("The ALJ stated that she gave the treating physician's opinion 'appropriate weight.' The particular weight given to the treating physician's opinion is unclear, and consequently, the Court cannot determine whether and to what degree the ALJ discounted the treating physician's opinion."); *Samuels v. Astrue*, 3:08-cv-900-J-HTS, 2009 WL 1659620, at *3 (M.D. Fla. June 15, 2009) ("The Court will not endeavor to determine the appropriate weight that should be afforded the treating physician's opinions."). Although there are limited circumstances when the failure to state the weight given to a treating physician may constitute harmless error, this is not the case here. *See*

24

*Caldwell v. Barnhart,* 261 Fed. Appx. 188, 191 (11th Cir. 2008) (holding ALJ's failure to discuss weight given to examining physician constituted harmless error where limitations assessed by physician would not affect plaintiff's ability to perform job cited by VE; ALJ's failure to discuss weight given to examining psychologist constituted harmless error where opinion did not contradict the ALJ's finding and was substantially similar to that of another doctor whose opinion was given substantial weight); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535-36 (6th Cir. 2001) (holding ALJ's failure to discuss a physician's opinion constituted harmless error where the ALJ had attributed limitations of the claimant that were consistent with the doctor's opinion).  In this case, the ALJ's failure to state with particularity the weight afforded to the opinions of Dr. Cox and Dr. Girouard was not harmless error because the ALJ did not adopt their findings and failed to adequately explain her reasoning for giving their opinions less than controlling weight.

Accordingly, the Court finds the ALJ failed to properly evaluate the medical opinions and, as such, the ALJ's decision is not supported by substantial evidence.  On remand, the ALJ shall reconsider the opinions of Dr. Cox and Dr. Girouard in accordance with this Order, taking care to specify the weight accorded to the opinions and to clearly articulate her reasons should she find their opinions are entitled to less than controlling weight.  Further, the ALJ should identify specific evidence that supports her reasons for accepting or rejecting their opinions.  Upon reconsideration of all medical opinions found in the record, the ALJ shall reassess Plaintiff's residual functional capacity.

Plaintiff's second argument is the ALJ failed to include all of Plaintiff's limitations in the hypothetical posed to the VE.  The Court has found the ALJ failed to properly

evaluate the medical opinions and therefore must engage in a reassessment of Plaintiff's residual functional capacity on remand.   Such reassessment would necessarily involve determining whether Plaintiff's non-exertional limitations, particularly pain, result in functional limitations beyond those previously found by the ALJ in light of her reconsideration of Dr. Cox and Dr. Girouard's opinion evidence.   As the Court has determined this case is due to be remanded for further proceedings, it is unnecessary to address this issue further.   *See Demenech v. Sec'y of the Dep't of Health & Human Servs.*, 913 F.2d 882, 884 (11th Cir. 1990) (per curiam) (concluding that certain arguments need not be addressed when the case would be remanded on other issues); *Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam) (declining to address certain issues because they were likely to be reconsidered on remand).   Of course, on remand, Plaintiff's claims must be evaluated in compliance with the applicable regulations and case law in all aspects.   For example, the underlying assumptions of hypothetical questions must accurately and comprehensively reflect the claimant's characteristics, and must be supported by substantial evidence. *McSwain v. Bowen.* 814 F.2d 617, 620-21 (11th Cir. 1987) (*per curiam*); *see also Jones v. Apfel,* 190 F.3d 1224, 1229 (11th Cir. 1999) ("In order for a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.").

## V. CONCLUSION

For the foregoing reasons, the Court finds the decision of the Commissioner is neither supported by substantial evidence, nor decided according to proper legal

26

standards.   Accordingly, the decision of the Commissioner is hereby **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g).  The case is **REMANDED** for additional proceedings consistent with this Order and Opinion.  On remand, the ALJ shall reopen the record and accept any additional evidence deemed appropriate.  The Clerk of Court is directed to enter judgment consistent with this Order and Opinion, and thereafter to close the file.[16]

Plaintiff is cautioned, however, that this opinion does not suggest Plaintiff is entitled to disability benefits.  Rather, it speaks only to the process the ALJ must engage in and the findings and analysis the ALJ must make before determining whether Plaintiff is disabled within the meaning of the Social Security Act.  *Phillips v. Barnhart*, 357 F.3d 1232, 1244 (11th Cir. 2004).

**DONE AND ORDERED** at Jacksonville, Florida, this 18th day of March, 2013.

THOMAS E. MORRIS
United States Magistrate Judge

Copies to: All counsel of record

---

[16] If Plaintiff were to ultimately prevail in this case upon remand to the Social Security Administration, any motion for attorney fees under 42 U.S.C. § 406(b) **must be filed within thirty (30) days** of the date the Commissioner issues a "Notice of Award" letter to the Plaintiff/claimant to award disability benefits.  *See Bergen v. Comm'r Soc. Sec.*, 454 F.3d 1273, 1278 n.2 (11th Cir. 2006) (recognizing under Fed. R. Civ. P. 54(d)(2)(B) the district court may enlarge the time for any attorney to petition for fees and suggesting time be stated in the judgment); *compare with* Fed. R. Civ. P. 54(d)(2)(B) and M.D. Fla. Loc. R. 4.18(a) (both requiring that unless a statute or court order provides otherwise, any motion for attorney fees must be filed no later than fourteen (14) days after entry of judgment) (emphasis added).  This Order and Opinion does not, however, extend the time limits for filing a motion for attorney fees under the Equal Access to Justice Act.